FILED
CLERK, U.S. DISTRICT COURT
3/28/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: TV DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CASIE HYNES,<br>  aka "Casie Little,"<br><br>    Defendant. | CR No. 2:24-cr-00205-HDV<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 287: False, Fictitious, or Fraudulent Claims; 18 U.S.C. § 982: Criminal Forfeiture] |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1343]

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Defendant and Relevant Entities

1. Defendant CASIE HYNES, also known as "Casie Little," was a resident of Los Angeles County.

2. Between October 2020, and August 2021, defendant HYNES incorporated at least six businesses, including Casie Hynes Consulting; Nasty Womxn Project, LLC; Joseph Little Consulting, LLC; She Suite Collective, LLC; and Casie Little, most of which listed defendant HYNES as the organizer and/or chief executive officer

1  ("CEO") of the business and listed one of defendant HYNES's
2  residences as the business address.
3      3.   Between in or around June 2020 and July 2021, defendant
4  HYNES also obtained and caused to be obtained employer identification
5  numbers ("EINs") for at least 24 businesses, including Joseph Little,
6  Caitlyn Hynes, Casie Little Consulting, College Access Project, Casie
7  & Joseph Little, Joseph Little Consulting, NW Project, Nasty Womxn
8  Project, She Suite Collective, SheSuiteCollective, She-Suite
9  Partners, She Suite Partners, College Club, She Suite Ventures,
10 Madeleine Weber, NW Project CA, JL Education, Casie Hynes RVOC TR
11 04122021, CL Services, CL Education, and Casie Hynes Property TR.
12      <u>The Paycheck Protection Program</u>
13      4.   The United States Small Business Administration ("SBA")
14 was an executive-branch agency of the United States government that
15 provided support to entrepreneurs and small businesses.  The mission
16 of the SBA was to maintain and strengthen the nation's economy by
17 enabling the establishment and viability of small businesses and by
18 assisting in the economic recovery of communities after disasters.
19      5.   As part of this effort, the SBA facilitated government-
20 backed loans through banks, credit unions, and other lenders.
21      6.   The Coronavirus Aid, Relief, and Economic Security
22 ("CARES") Act was a federal law enacted in or about March 2020 that
23 was designed to provide emergency financial assistance to Americans
24 suffering economic harm as a result of the COVID-19 pandemic.  One
25 form of assistance provided by the CARES Act was the authorization of
26 United States taxpayer funds in forgivable loans to small businesses
27 for job retention and certain other expenses, through a program
28 referred to as the Paycheck Protection Program ("PPP").

7. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant, through its authorized representative, was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the small business, through its authorized representative, was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP, and a business could not receive a loan of more than 2.5 times its average monthly payroll costs. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

8. A PPP loan application was processed by a participating financial institution ("lender"). If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

3

9. PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

### The Economic Injury Disaster Loan Program

10. The Economic Injury Disaster Loan ("EIDL") Program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

11. The CARES Act authorized the SBA to provide EIDLs up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses applying for an EIDL.

12. To obtain an EIDL and an advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period extended from January 1, 2019, to January 31, 2020. Applicants certified that all the information in the application was true and correct to the best of their knowledge.

13. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.

The amount of the loan was determined, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above.

14. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

B. THE SCHEME TO DEFRAUD

15. Beginning no later than in or around June 2020, and continuing until at least in or around June 2021, in Los Angeles, within the Central District of California, and elsewhere, defendant HYNES, knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud lenders and the SBA, and to obtain money and property from the lenders and the SBA by means of material false pretenses, representations, and promises, and the concealment of material facts.

16. The fraudulent scheme operated and was carried out, in substance, as follows:

    a. Defendant HYNES incorporated and/or obtained EINs for a variety of businesses (collectively, the "HYNES Companies").

    b. Defendant HYNES applied for PPP and EIDL loans on behalf of the HYNES Companies. In those applications, defendant HYNES made false statements to lenders and the SBA, including false representations regarding the number of employees to whom the companies had paid wages and the amount of those purported wages, and false certifications that the loans would be used for permissible

business purposes.  In some instances, and in order to conceal her involvement with the loans and make the companies seem more legitimate, defendant HYNES applied for the loans using the names and personal information of real persons as purported officers or employees of the businesses, knowing that those persons did not hold those roles and had not authorized defendant HYNES to use their names and information in connection with the applications.

    c. In connection with those applications, defendant HYNES also electronically submitted, and cause to be submitted, false documents to lenders in support of the fraudulent PPP and EIDL loan applications, including false and fictitious bank and tax documents, and documents bearing the forged signatures of real persons.

    d. At the time of these applications, defendant HYNES knew that the representations regarding the numbers of employees and purported wages paid and intended use of the loan proceeds were false, the bank and tax documents were fabricated, and the signatures were forged.  In making these false representations and submitting these fabricated documents, defendant HYNES knew and intended that the lenders would rely on them to approve the applications and determine the amounts to be disbursed under the PPP and EIDL programs.

    e. Defendant HYNES directed that PPP and EIDL loan proceeds be deposited into bank accounts that defendant HYNES controlled.

    f. Defendant HYNES then used the fraudulently obtained PPP and EIDL loan proceeds for her own personal benefit, including for expenses prohibited under the requirements of the PPP and EIDL programs.

17.  Between June 2020 and June 2021, defendant HYNES submitted and caused to be submitted approximately 23 fraudulent PPP loan applications to various federally insured financial institutions and approximately 63 fraudulent EIDL applications to the SBA on behalf of the HYNES Companies seeking a total of approximately $3,174,323 in PPP and EIDL funds, and actually received approximately $2,255,244 in fraudulent proceeds from those loans based on the false and fraudulent statements, representations, and promises in the applications.

C.   USE OF THE WIRES

18.  On or about April 14, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant HYNES, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of, by means of wire communications in interstate commerce, a PPP loan application in the name of JL Education from California, to American Lending Center via a server outside the State of California.

COUNT TWO

[18 U.S.C. §§ 287, 2(b)]

19. The Grand Jury re-alleges paragraphs 1 through 3 of this Information here.

A. <u>INTRODUCTORY ALLEGATIONS</u>

At times relevant to this Information:

<u>The CARES Act and Coronavirus Response Credits</u>

20. The Internal Revenue Service ("IRS") was an agency of the United States responsible for collecting taxes and administering the Internal Revenue Code.

21. The CARES Act authorized an employee retention tax credit (the "ERC") that a small business could use to reduce the employment tax it owed to the IRS. To qualify, the business had to have been operational in 2020 and to have experienced (1) at least a partial suspension of the business's operations because of a government COVID-19 order (<u>e.g.</u>, an order limiting commerce, group meetings, or travel) or (2) a significant decline in profits. The ERC equaled a percentage of the wages that the business paid to its employees during the quarter, subject to a maximum amount.

22. The Families First Coronavirus Response Act ("Coronavirus Response Act") and its amendments authorized the IRS to give a credit against employment taxes to reimburse businesses for the wages paid to employees who were on sick or family leave and could not work because of COVID-19 (the "paid sick and family leave credit," and, collectively with the ERC, the "COVID-19 Tax Credits"). The paid sick and family leave credit equaled the wages the business paid to employees during the sick or family leave, subject to a maximum amount.

23. The taxpayer could request the COVID-19 Tax Credits on the IRS Form 941 (Employer's Quarterly Federal Tax Return) ("Form 941") and was required to truthfully state, among other things, the number of employees and business's quarterly wages. The COVID-19 Tax Credits could generate refunds, and the taxpayer could request that the IRS pay the refunds in advance, before the business filed its quarterly employment tax return, through the filing of an IRS Form 7200 (Advance Payment of Employer Credits Due to COVID-19) ("Form 7200").

24. Federal Tax Deposits ("FTDs"), among other things, consisted of employment taxes, including taxes that were withheld from employees' wages. Certain employers were required to make periodic FTDs to the IRS, normally on a monthly or semiweekly basis. On the IRS Form 941, the employer could then deduct the FTDs paid to the IRS for the applicable quarter from the total amount of employment taxes due to the IRS.

<u>She Suite Ventures</u>

25. In or around January 2021, defendant HYNES obtained an EIN on behalf of a business called She Suite Ventures.

26. For tax years 2020 through 2021, She Suite Ventures had no substantial business operations and IRS records reflect neither (i) the issuance of any Forms W-2, Forms 1099, or other wage reporting forms to any individuals, nor (ii) the payment of any FTDs to the IRS on She Suite Ventures' behalf.

B. <u>THE FALSE CLAIM</u>

27. On or about July 13, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant HYNES made and presented, and willfully caused to be made and presented, to

9

1  the IRS, which is part of the United States Department of the
2  Treasury, a false, fictitious, and fraudulent claim against the
3  United States for the payment of a tax refund – namely, a Form 7200
4  filed on behalf of She Suite Ventures for the fourth quarter of 2021,
5  requesting $195,911.41 as an advance payment of COVID-19 Tax Credits
6  – which claim defendant HYNES then knew to be false, fictitious, and
7  fraudulent in that She Suite Ventures was not entitled to the claimed
8  advance payment as reported on the return, including because She
9  Suite Ventures did not have the number of employees claimed on the
10 return and had not paid employees the amount in wages, tips, and
11 other compensation reported on that return.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the defendant's conviction of the offense set forth in Count One of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including but not limited to $120,925.10 seized on or about May 24, 2023, from Bluevine checking account ending in 5915, held in the name of Joseph Little Consulting, Joseph Little; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

11

1 been substantially diminished in value; or (e) has been commingled
2 with other property that cannot be divided without difficulty.

E. MARTIN ESTRADA
United States Attorney

*/s/ Mack E. Jenkins*

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Chief, Major Frauds Section