E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0526
     Facsimile: (213) 894-6269
     E-mail:   Kristen.Williams@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**F I L E D**
CLERK, U.S. DISTRICT COURT

3/28/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR  2:24-cr-00205-HDV |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT CASIE HYNES |
| v. | |
| CASIE HYNES, | |
| Defendant. | |

1.   Subject to the approval of the United States Department of Justice, Tax Division, this constitutes the plea agreement between CASIE HYNES ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the investigation of fraudulent applications for disaster loans authorized by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act and false claims to the Internal Revenue Service in seeking refunds of the Employee Retention Credit enacted as a part of COVID relief in the CARES Act.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

1

<u>DEFENDANT'S OBLIGATIONS</u>

2      2.   Defendant agrees to:

3           a.   Give up the right to indictment by a grand jury and,

4      at the earliest opportunity requested by the USAO and provided by the

5      Court, appear and plead guilty to a two-count information in the form

6      attached to this agreement as Exhibit A or a substantially similar

7      form, which charges defendant with wire fraud, in violation of 18

8      U.S.C. § 1343, and false claims, in violation of 18 U.S.C. § 287.

9           b.   Not contest facts agreed to in this agreement.

10          c.   Abide by all agreements regarding sentencing contained

11     in this agreement.

12          d.   Appear for all court appearances, surrender as ordered

13     for service of sentence, obey all conditions of any bond, and obey

14     any other ongoing court order in this matter.

15          e.   Not commit any crime; however, offenses that would be

16     excluded for sentencing purposes under United States Sentencing

17     Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

18     within the scope of this agreement.

19          f.   Be truthful at all times with the United States

20     Probation and Pretrial Services Office and the Court.

21          g.   Pay the applicable special assessments at or before

22     the time of sentencing unless defendant has demonstrated a lack of

23     ability to pay such assessments.

24          h.   Defendant agrees that any and all criminal debt

25     ordered by the Court will be due in full and immediately.  The

26     government is not precluded from pursuing, in excess of any payment

27     schedule set by the Court, any and all available remedies by which to

28

1 | satisfy defendant's payment of the full financial obligation,
2 | including referral to the Treasury Offset Program.

3 |       i.    Complete the Financial Disclosure Statement on a form
4 | provided by the USAO and, within 30 days of defendant's entry of a
5 | guilty plea, deliver the signed and dated statement, along with all
6 | of the documents requested therein, to the USAO by either email at
7 | usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial
8 | Litigation Section at 300 North Los Angeles Street, Suite 7516, Los
9 | Angeles, CA 90012.  Defendant agrees that defendant's ability to pay
10 | criminal debt shall be assessed based on the completed Financial
11 | Disclosure Statement and all required supporting documents, as well
12 | as other relevant information relating to ability to pay.

13 |       j.    Authorize the USAO to obtain a credit report upon
14 | returning a signed copy of this plea agreement.

15 |       k.    Consent to the USAO inspecting and copying all of
16 | defendant's financial documents and financial information held by the
17 | United States Probation and Pretrial Services Office.

18 |    3.    Defendant further agrees:

19 |       a.    To forfeit all right, title, and interest in and to
20 | any and all monies, properties, and/or assets of any kind, derived
21 | from or acquired as a result of the illegal activity to which
22 | defendant is pleading guilty, specifically including, but not limited
23 | to $120,925.10 seized on or about May 24, 2023, from Bluevine
24 | checking account ending in 5915, held in the name of Joseph Little
25 | Consulting, Joseph Little (collectively, the "Forfeitable Property").

26 |       b.    To the Court's entry of an order of forfeiture at or
27 | before sentencing with respect to the Forfeitable Property and to the
28 | forfeiture of the property.

c.    To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

d.    Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of herself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right she may have to seek remission or mitigation of the forfeiture of the Forfeitable Property.

e.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

f.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

g.    To prevent the transfer, sale, destruction, or loss of any and all assets described above to the extent defendant has the ability to do so.

h.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

i.    The parties further agree that, pursuant to the Asset Forfeiture Policy Manual (2021), Chapter 14, Sec. II.B.2 and 28 C.F.R. Part 9.8, upon a determination by the government that it can make the required representations set forth therein, and if requested by defendant, the government will submit a restoration request to the

4

Money Laundering and Asset Recovery Section of the Department of Justice, seeking approval for any assets forfeited to be restored to the victims in this case, which may, in turn, satisfy in full or part any restitution order. Defendant has acknowledged that the Attorney General, or his designee, has the sole discretion to approve or deny the restoration request.

    j.   With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

    4.   Defendant agrees to cooperate with the Internal Revenue Service in the determination of defendant's tax liability for 2021 and 2022. Defendant agrees that:

    a.   Defendant will file, prior to the time of sentencing, amended returns for the years subject to the above admissions, correctly reporting income and correcting improper deductions and

5

1   credits; will, if requested to do so by the Internal Revenue Service,

2   provide the Internal Revenue Service with information regarding the

3   years covered by the returns; will pay to the Fiscal Clerk of the

4   Court at or before sentencing all additional taxes and all penalties

5   and interest assessed by the Internal Revenue Service on the basis of

6   the returns; and will promptly pay to the Fiscal Clerk of the Court

7   all additional taxes and all penalties and interest thereafter

8   determined by the Internal Revenue Service to be owing as a result of

9   any computational error(s).  Payments may be made to the Clerk,

10  United States District Court, Fiscal Department, 255 East Temple

11  Street, Room 1178, Los Angeles, California 90012.

12          b.   Nothing in this agreement forecloses or limits the

13  ability of the Internal Revenue Service to examine and make

14  adjustments to defendant's returns after they are filed.

15          c.   Defendant will not, after filing the returns, file any

16  claim for refund of taxes, penalties, or interest for amounts

17  attributable to the returns filed in connection with this plea

18  agreement.

19          d.   Defendant gives up any and all objections that could

20  be asserted to the Examination Division of the Internal Revenue

21  Service receiving materials or information obtained during the

22  criminal investigation of this matter, including materials and

23  information obtained through grand jury subpoenas.

                    THE USAO'S OBLIGATIONS

25      5.   The USAO agrees to:

26          a.   Not contest facts agreed to in this agreement.

27          b.   Abide by all agreements regarding sentencing contained

28  in this agreement.

1          c.   At the time of sentencing, provided that defendant
2 demonstrates an acceptance of responsibility for the offenses up to
3 and including the time of sentencing, recommend a two-level reduction
4 in the applicable Sentencing Guidelines offense level, pursuant to
5 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
6 additional one-level reduction if available under that section.

7          d.   Except for criminal tax violations (including
8 conspiracy to commit such violations chargeable under 18 U.S.C.
9 § 371), not further criminally prosecute defendant for violations of
10 bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity
11 theft, in violation of 18 U.S.C. § 1028A; and money laundering, in
12 violation of 18 U.S.C. §§ 1956 and 1957, arising out of defendant's
13 conduct described in the agreed-to factual basis set forth in
14 paragraph 15 below.  Defendant understands that the USAO is free to
15 criminally prosecute defendant for any other unlawful past conduct or
16 any unlawful conduct that occurs after the date of this agreement.
17 Defendant agrees that at the time of sentencing the Court may
18 consider the uncharged conduct in determining the applicable
19 Sentencing Guidelines range, the propriety and extent of any
20 departure from that range, and the sentence to be imposed after
21 consideration of the Sentencing Guidelines and all other relevant
22 factors under 18 U.S.C. § 3553(a).

23          e.   Recommend that defendant be sentenced to a term of
24 imprisonment no higher than the low end of the applicable Sentencing
25 Guidelines range, provided that the offense level used by the Court
26 to determine that range is 28 or higher and provided that the Court
27 does not depart downward in offense level or criminal history
28 category.  For purposes of this agreement, the low end of the

1  Sentencing Guidelines range is that defined by the Sentencing Table

2  in U.S.S.G. Chapter 5, Part A.

3                          NATURE OF THE OFFENSES

4      6.  Defendant understands that for defendant to be guilty of

5  the crime charged in count one, that is, wire fraud, in violation of

6  Title 18, United States Code, Section 1343, the following must be

7  true: (1) defendant knowingly devised or participated in a scheme or

8  plan to defraud, or a scheme to obtain money or property by means of

9  false and fraudulent pretenses, representations, promises, or omitted

10 facts; (2) the statements made or facts omitted were material; (3)

11 the defendant acted with the intent to defraud, that is, the intent

12 to deceive and cheat; and (4) the person used or caused to be used an

13 interstate wire communication to carry out or attempt to carry out an

14 essential part of the scheme.

15     7.  Defendant understands that for defendant to be guilty of

16 the crime charged in count two, that is, false claims, in violation

17 of Title 18, United States Code, Section 287, the following must be

18 true: (1) defendant made or presented a false, fictitious, or

19 fraudulent claim to a department of the United States; (2) defendant

20 knew such claim was false, fictitious, or fraudulent; and (3)

21 defendant did so with the specific intent to violate the law or with

22 a consciousness that what she was doing was wrong.

23                       PENALTIES AND RESTITUTION

24     8.  Defendant understands that the statutory maximum sentence

25 that the Court can impose for a violation of Title 18, United States

26 Code, Section 1343, is: 20 years' imprisonment; a three-year period

27 of supervised release; a fine of $250,000 or twice the gross gain or

28

gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

9.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 287, is: 5 years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.   Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 25 years' imprisonment; a three-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

11.   Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty; and (b) any charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those

charges.  The parties currently believe that the applicable amount of restitution is approximately $2,255,244, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

12.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that she is pleading guilty to felonies and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

14.  Defendant and her counsel have discussed the fact that, and defendant understands that, if defendant is not a United States

citizen, the convictions in this case make it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including her attorney or the Court, can predict to an absolute certainty the effect of her convictions on her immigration status.  Defendant nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that her pleas may entail, even if the consequence is automatic removal from the United States.

## FACTUAL BASIS

15.  Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 17 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

## PPP and EIDL Fraud Scheme

Beginning in or around June 2020 and continuing through at least in or around December 2021, in Los Angeles County, within the Central

District of California, defendant knowingly and with intent to defraud executed a scheme to obtain money from various financial institutions and the United States Small Business Administration ("SBA") through fraudulent applications for loans through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program, programs designed to provide relief from the government to small businesses to assist during the COVID-19 pandemic.

Between 2020 and 2021, defendant requested employer identification numbers for (and in some instances incorporated with the California Secretary of State) approximately 20 entities, including entities associated with a t-shirt business that she and two associates owned and operated (Nasty Womxn Project and She Suite Collective) and entities purportedly associated with J.L., C.H., S.S., M.W., and others, but which defendant knew were not actually affiliated with those individuals (such as JL Education, Casie Hynes Consulting, College Club, She Suite Ventures, and NW Project).

Between June 2020 and December 2021, defendant submitted and caused to be submitted at least 23 fraudulent PPP loan applications to various federally insured financial institutions (the "PPP Lenders") and at least 59 fraudulent EIDL applications to the SBA in the names of both existing and newly created entities, which applications were transmitted via interstate wire to servers associated with the PPP and EIDL program located outside of California.  On those applications, defendant at times used the personal information and signatures of J.L., C.H., S.S., M.W., and others, without their authorization.  In the applications, defendant also made false statements, including providing false information as

1   to the purported number of employees and average monthly payroll and

2   the purported ownership and control of the entities.  Defendant

3   typically also submitted fabricated tax documents and bank statements

4   in support of the PPP and EIDL applications.  Defendant made these

5   false statements and included fraudulent supporting documentation

6   knowing and intending that the PPP Lenders and SBA would rely upon

7   the false statements and fraudulent supporting documentation, which

8   were material to the PPP Lenders and SBA as they determined whether

9   to approve the loans and the amount of any approved loans.

10        In order to execute the scheme to defraud and obtain money and

11   property from the PPP Lenders and SBA, on or about April 14, 2021,

12   defendant electronically submitted to American Lending Center ("ALC")

13   an application on behalf of JL Education seeking a PPP loan in the

14   amount of $416,666.67, which application was transmitted via

15   interstate wire to a server located outside of California.  In the

16   application, defendant falsely stated that JL Education was wholly

17   owned by J.L., had 20 employees as of December 31, 2020, and had an

18   average monthly payroll of $166,666.67.  In fact, as defendant knew,

19   J.L. did not own JL Education, and the company did not have the

20   employees or average monthly payroll stated.  Defendant also used

21   J.L.'s electronic signature to sign the application without J.L.'s

22   knowledge or permission.  In support of JL Education's PPP loan

23   application, defendant submitted, among other things, a fabricated

24   February 2020 bank account purportedly for JL Education, a fabricated

25   2019 Form 1120 federal corporate tax return for JL Education, and a

26   fraudulent 2019 payroll summary report of JL Education employees

27   showing wages earned, even though defendant knew those employees did

28   not work for JL Education or receive those wages from it.  Defendant

1  submitted this false and fraudulent information knowing and intending
2  that ALC would rely on it in approving the loan.

3      In reliance on the fraudulent loan applications defendant
4  submitted and the false statements and fabricated documents therein,
5  the PPP Lenders and the SBA approved PPP and EIDL loans for various
6  of the entities defendant created.  The PPP Lenders and SBA disbursed
7  proceeds from these loans into entity accounts controlled by
8  defendant, many of which loan proceeds were subsequently transferred
9  to other accounts controlled by defendant and/or used for defendant's
10 personal expenses.

11     Defendant admits that the intended loss related to defendant's
12 fraudulent PPP and EIDL loan scheme is approximately $3,174,323, and
13 that she received approximately $2,255,244 in fraudulent proceeds
14 from those loans.  Defendant further admits that she caused losses to
15 more than 10 victims and obtained more than $1 million in gross
16 receipts from one or more financial institutions through this scheme.

17 False Claims

18     Defendant also used some of the same companies discussed above
19 to submit tax forms to the Internal Revenue Service ("IRS")
20 requesting refunds.  Following the outbreak of COVID-19, Congress
21 enacted statues authorizing the IRS to reduce the employment tax
22 burdens of small businesses and reimburse those businesses for wages
23 paid to employees who were on sick or family leave and could not work
24 because of the pandemic.  For tax periods in 2020 and 2021, the IRS
25 offered the Employee Retention Credit ("ERC") and paid sick and
26 family leave credit (collectively, the "COVID-19 Tax Credits") to
27 businesses that were significantly impacted by the pandemic.

28

1     Between in or around May 2021 and in or around April 2022,

2 defendant caused to be submitted tax forms – namely, Advance Payment

3 of Employer Credits due to COVID-19 ("Form 7200"), Employer's

4 Quarterly Federal Tax Returns ("Form 941"), and United States

5 Corporation Income Tax Returns ("Form 1120") – on behalf of She Suite

6 Ventures; Nasty Womxn Project LLC; and Casie Hynes Consulting

7 (collectively, the "False Returns"), seeking refunds based on false

8 statements, including fraudulently claimed COVID-19 Tax Credits:

| BUSINESS NAME | EIN | FORM | YEAR / QUARTER | DATE RECEIVED | REFUND REQUESTED |
|---|---|---|---|---|---|
| She Suite Ventures | 86-1519459 | 941 | 2020/2 | 5/11/2021 | $104,399.59 |
| She Suite Ventures | 86-1519459 | 7200 | 2020/3 | 6/26/2021 | $104,399.59 |
| She Suite Ventures | 86-1519459 | 7200 | 2020/4 | 6/26/2021 | $104,399.59 |
| She Suite Ventures | 86-1519459 | 941 | 2021/1 | 5/11/2021 | $166,557.99 |
| She Suite Ventures | 86-1519459 | 7200 | 2021/2 | 7/13/2021 | $195,911.41 |
| She Suite Ventures | 86-1519459 | 7200 | 2021/3 | 7/13/2021 | $195,911.41 |
| She Suite Ventures | 86-1519459 | 7200 | 2021/4 | 7/13/2021 | $195,911.41 |
| Nasty Womxn Project LLC | 85-3519972 | 1120 | 2020 | 8/23/2021 | $42,507.00 |
| Nasty Womxn Project LLC | 85-3519972 | 941 | 2021/1 | 6/26/2021 | $36,041.83 |
| Nasty Womxn Project LLC | 85-3519972 | 7200 | 2021/2 | 6/26/2021 | $36,041.83 |
| Nasty Womxn Project LLC | 85-3519972 | 7200 | 2021/3 | 6/26/2021 | $36,041.83 |
| Casie Hynes Consulting | 81-2476098 | 1120 | 2020/4 | 4/19/2022 | $37,580.00 |

24     In fact, as defendant knew, these entities had little to no

25 substantial business operations in 2020 and 2021, and did not have

26 the number of employees claimed, pay the quarterly wages claimed for

27 those employees, or make the federal tax deposits claimed.  In the

28 cases of Nasty Womxn Project LLC and Casie Hynes Consulting,

defendant also knew that those entities did not have the gross receipts she reported on their Form 1120s.

For example, on or about July 13, 2021, defendant caused a Form 7200 to be filed on behalf of She Suite Ventures for the fourth quarter of 2021, requesting $195,911.41 as an advance payment of COVID-19 Tax Credits.  In the form, defendant falsely claimed that She Suite Ventures had 20 employees and stated that She Suite Ventures had reported $530,108.00 in wages, tips, and other compensation paid on its most recent Form 941 from the first quarter of 2021.  Defendant made these statements (1) knowing that She Suite Ventures did not have that many employees or pay employees the reported amount in wages, tips, and other compensation, and (2) with the specific intent to violate the law and a consciousness that what she was doing was wrong.

Defendant admits that she made knowing and willful false statements on the False Returns that she caused to be submitted to the IRS, and sought approximately $1,255,703 in COVID-19 Tax Credits and tax refunds through those False Returns, none of which the IRS paid.

SENTENCING FACTORS

16.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the

Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

17. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. § 2B1.1(a)(1)] |
| Loss Between $1.5 Million and $9.5 Million: | +16-18 | [U.S.S.G. § 2B1.1(b)(1)(I)-(J)] |
| More than 10 Victims: | +2 | [U.S.S.G. § 2B1.1(b)(2)(A)(i)] |
| Use of Means of Identification | +2 | [U.S.S.G. § 2B1.1(b)(11)(C)(i)] |
| More than $1 Million from a Financial Institution | +2 | [U.S.S.G. § 2B1.1(b)(17)] |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1] |

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 5(c) are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraph 31 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed, with the exception that (1) defendant agrees the applicable loss is at least greater than $1.5 million, corresponding to an adjustment of

plus-sixteen under U.S.S.G. § 2B1.1(b)(1)(I), while the government reserves the right to argue—and defendant the right to contest—that the applicable loss is in fact between $3.5 million and $9.5 million, corresponding to an adjustment of plus-eighteen under U.S.S.G. § 2B1.1(b)(1)(J); (2) the government reserves the right to argue for—and defendant to contest—the applicability of a two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10); (3) defendant reserves the right to argue—and the government the right to contest—that departures under U.S.S.G. §§ 5H1.4 and 5H1.6 should apply; and (4) both parties may argue for or contest the applicability of a two-level reduction under U.S.S.G. § 4C1.1(a).  Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

18.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

19.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).  However, defendant agrees not to argue, either orally or in writing, for a sentence of less than 12 months' imprisonment.

WAIVER OF CONSTITUTIONAL RIGHTS

20.   Defendant understands that by pleading guilty, defendant gives up the following rights:

      a.   The right to persist in a plea of not guilty.

      b.   The right to a speedy and public trial by jury.

      c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

      d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

      e.   The right to confront and cross-examine witnesses against defendant.

      f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

      g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

      h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION

21.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to

1    appeal defendant's convictions on the offenses to which defendant is

2    pleading guilty.  Defendant understands that this waiver includes,

3    but is not limited to, arguments that the statutes to which defendant

4    is pleading guilty are unconstitutional, and any and all claims that

5    the statement of facts provided herein is insufficient to support

6    defendant's pleas of guilty.

7                LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

8         22.  Defendant gives up the right to appeal all of the

9    following: (a) the procedures and calculations used to determine and

10   impose any portion of the sentence; (b) the term of imprisonment

11   imposed by the Court, including, to the extent permitted by law, the

12   constitutionality or legality of defendant's sentence, provided it is

13   within the statutory maximum; (c) the fine imposed by the Court,

14   provided it is within the statutory maximum; (d) the amount and terms

15   of any restitution order, provided it requires payment of no more

16   than $2,255,244; (e) the term of probation or supervised release

17   imposed by the Court, provided it is within the statutory maximum;

18   and (f) any of the following conditions of probation or supervised

19   release imposed by the Court: the conditions set forth in Second

20   Amended General Order 20-04 of this Court; the drug testing

21   conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the

22   alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

23        23.  Defendant also gives up any right to bring a post-

24   conviction collateral attack on the convictions or sentence,

25   including any order of restitution, except a post-conviction

26   collateral attack based on a claim of ineffective assistance of

27   counsel, a claim of newly discovered evidence, or an explicitly

28   retroactive change in the applicable Sentencing Guidelines,

sentencing statutes, or statutes of conviction.  Defendant
understands that this waiver includes, but is not limited to,
arguments that the statutes to which defendant is pleading guilty are
unconstitutional, and any and all claims that the statement of facts
provided herein is insufficient to support defendant's pleas of
guilty.

24.  This agreement does not affect in any way the right of the
USAO to appeal the sentence imposed by the Court.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

25.  Defendant agrees that if, after entering guilty pleas
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty pleas on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge that was either dismissed or not filed as a result
of this agreement, then (i) any applicable statute of limitations
will be tolled between the date of defendant's signing of this
agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

26.  Defendant agrees that if any count of conviction is
vacated, reversed, or set aside, the USAO may: (a) ask the Court to
resentence defendant on any remaining count of conviction, with both

the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty plea on any remaining count of conviction, with both the USAO and defendant being released from all their obligations under this agreement, or (c) leave defendant's remaining conviction, sentence, and plea agreement intact.  Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO.

## EFFECTIVE DATE OF AGREEMENT

27.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

28.  Defendant agrees that if defendant, at any time after the effective date of this agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the USAO will be relieved of all its obligations under this agreement.

29.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge

22

that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

30. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

31.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 17 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

32.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

33. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

34. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney


_____                    3/15/2024
KRISTEN A. WILLIAMS                                 Date
Assistant United States Attorney

_____                    3-14-24
CASIE HYNES                                         Date
Defendant

_____                    3/15/2024
MARK J. WERKSMAN                                    Date
Attorney for Defendant CASIE HYNES

25

1                        CERTIFICATION OF DEFENDANT

2          I have read this agreement in its entirety.  I have had enough

3    time to review and consider this agreement, and I have carefully and

4    thoroughly discussed every part of it with my attorney.  I understand

5    the terms of this agreement, and I voluntarily agree to those terms.

6    I have discussed the evidence with my attorney, and my attorney has

7    advised me of my rights, of possible pretrial motions that might be

8    filed, of possible defenses that might be asserted either prior to or

9    at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10   of relevant Sentencing Guidelines provisions, and of the consequences

11   of entering into this agreement.  No promises, inducements, or

12   representations of any kind have been made to me other than those

13   contained in this agreement.  No one has threatened or forced me in

14   any way to enter into this agreement.  I am satisfied with the

15   representation of my attorney in this matter, and I am pleading

16   guilty because I am guilty of the charges and wish to take advantage

17   of the promises set forth in this agreement, and not for any other

18   reason.

19   _____        _____

20   CASIE HYNES                             Date       3-14-24
     Defendant

21

22

23

24

25

26

27

28

                                    26

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am CASIE HYNES's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client.  Further, I have fully advised my client of her rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____          3/15/2024
MARK J. WERKSMAN                         Date
Attorney for Defendant CASIE HYNES

27

Exhibit A

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,        CR No.

11            Plaintiff,             I N F O R M A T I O N

12            v.                     [18 U.S.C. § 1343:  Wire Fraud; 18
                                     U.S.C. § 287: False, Fictitious,
13  CASIE HYNES,                     or Fraudulent Claims; 18 U.S.C.
      aka "Casie Little,"            § 982: Criminal Forfeiture]
14
                                     
15            Defendant.

16        The United States Attorney charges:

17                           COUNT ONE

18                      [18 U.S.C. § 1343]

19  A.    INTRODUCTORY ALLEGATIONS

20        At times relevant to this Information:

21        Defendant and Relevant Entities

22        1.    Defendant CASIE HYNES, also known as "Casie Little," was a

23  resident of Los Angeles County.

24        2.    Between October 2020, and August 2021, defendant HYNES

25  incorporated at least six businesses, including Casie Hynes

26  Consulting; Nasty Womxn Project, LLC; Joseph Little Consulting, LLC;

27  She Suite Collective, LLC; and Casie Little, most of which listed

28  defendant HYNES as the organizer and/or chief executive officer

("CEO") of the business and listed one of defendant HYNES's
residences as the business address.

3.    Between in or around June 2020 and July 2021, defendant
HYNES also obtained and caused to be obtained employer identification
numbers ("EINs") for at least 24 businesses, including Joseph Little,
Caitlyn Hynes, Casie Little Consulting, College Access Project, Casie
& Joseph Little, Joseph Little Consulting, NW Project, Nasty Womxn
Project, She Suite Collective, SheSuiteCollective, She-Suite
Partners, She Suite Partners, College Club, She Suite Ventures,
Madeleine Weber, NW Project CA, JL Education, Casie Hynes RVOC TR
04122021, CL Services, CL Education, and Casie Hynes Property TR.

The Paycheck Protection Program

4.    The United States Small Business Administration ("SBA")
was an executive-branch agency of the United States government that
provided support to entrepreneurs and small businesses.  The mission
of the SBA was to maintain and strengthen the nation's economy by
enabling the establishment and viability of small businesses and by
assisting in the economic recovery of communities after disasters.

5.    As part of this effort, the SBA facilitated government-
backed loans through banks, credit unions, and other lenders.

6.    The Coronavirus Aid, Relief, and Economic Security
("CARES") Act was a federal law enacted in or about March 2020 that
was designed to provide emergency financial assistance to Americans
suffering economic harm as a result of the COVID-19 pandemic.  One
form of assistance provided by the CARES Act was the authorization of
United States taxpayer funds in forgivable loans to small businesses
for job retention and certain other expenses, through a program
referred to as the Paycheck Protection Program ("PPP").

7.   To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  The applicant, through its authorized representative, was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the small business, through its authorized representative, was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP, and a business could not receive a loan of more than 2.5 times its average monthly payroll costs.  In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

8.   A PPP loan application was processed by a participating financial institution ("lender").  If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9.    PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.  Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

The Economic Injury Disaster Loan Program

10.    The Economic Injury Disaster Loan ("EIDL") Program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

11.    The CARES Act authorized the SBA to provide EIDLs up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses applying for an EIDL.

12.    To obtain an EIDL and an advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period extended from January 1, 2019, to January 31, 2020.  Applicants certified that all the information in the application was true and correct to the best of their knowledge.

13.    EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.

4

The amount of the loan was determined, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above.

14.   Any funds issued under an EIDL or advance were issued directly by the SBA.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  Borrowers, as a part of the EIDL loan application, certified that they would use loan proceeds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter."  If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

B.   THE SCHEME TO DEFRAUD

15.   Beginning no later than in or around June 2020, and continuing until at least in or around December 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant HYNES, knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud lenders and the SBA, and to obtain money and property from the lenders and the SBA by means of material false pretenses, representations, and promises, and the concealment of material facts.

16.   The fraudulent scheme operated and was carried out, in substance, as follows:

a.   Defendant HYNES incorporated and/or obtained EINs for a variety of businesses (collectively, the "HYNES Companies").

b.   Defendant HYNES applied for PPP and EIDL loans on behalf of the Hynes Companies.  In those applications, defendant

5

HYNES made false statements to lenders and the SBA, including false representations regarding the number of employees to whom the companies had paid wages and the amount of those purported wages, and false certifications that the loans would be used for permissible business purposes.  In some instances, and in order to conceal her involvement with the loans and make the companies seem more legitimate, defendant HYNES applied for the loans using the names and personal information of real persons as purported officers or employees of the businesses, knowing that those persons did not hold those roles and had not authorized defendant HYNES to use their names and information in connection with the applications.

c.   In connection with those applications, defendant HYNES also electronically submitted, and cause to be submitted, false documents to lenders in support of the fraudulent PPP and EIDL loan applications, including false and fictitious bank and tax documents, and documents bearing the forged signatures of real persons.

d.   At the time of these applications, defendant HYNES knew that the representations regarding the numbers of employees and purported wages paid and intended use of the loan proceeds were false, the bank and tax documents were fabricated, and the signatures were forged.  In making these false representations and submitting these fabricated documents, defendant HYNES knew and intended that the lenders would rely on them to approve the applications and determine the amounts to be disbursed under the PPP and EIDL programs.

e.   Defendant HYNES directed that PPP and EIDL loan proceeds be deposited into bank accounts that defendant HYNES controlled.

f.    Defendant HYNES then used the fraudulently obtained PPP and EIDL loan proceeds for her own personal benefit, including for expenses prohibited under the requirements of the PPP and EIDL programs.

17.    Between June 2020 and June 2021, defendant HYNES submitted and caused to be submitted approximately 23 fraudulent PPP loan applications to various federally insured financial institutions and approximately 63 fraudulent EIDL applications to the SBA on behalf of the HYNES Companies seeking a total of approximately $3,174,323 in PPP and EIDL funds, and actually received approximately $2,255,244 in fraudulent proceeds from those loans based on the false and fraudulent statements, representations, and promises in the applications.

C.    USE OF THE WIRES

18.    On or about April 14, 2021, in Los Angeles, within the Central District of California, and elsewhere, defendant HYNES, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of, by means of wire communications in interstate commerce, a PPP loan application in the name of JL Education from California, to American Lending Center via a server outside the State of California.

COUNT TWO

[18 U.S.C. §§ 287, 2(b)]

19.   The Grand Jury re-alleges paragraphs 1 through 3 of this Information here.

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

The CARES Act and Coronavirus Response Credits

20.   The Internal Revenue Service ("IRS") was an agency of the United States responsible for collecting taxes and administering the Internal Revenue Code.

21.   The CARES Act authorized an employee retention tax credit (the "ERC") that a small business could use to reduce the employment tax it owed to the IRS.  To qualify, the business had to have been operational in 2020 and to have experienced (1) at least a partial suspension of the business's operations because of a government COVID-19 order (e.g., an order limiting commerce, group meetings, or travel) or (2) a significant decline in profits.  The ERC equaled a percentage of the wages that the business paid to its employees during the quarter, subject to a maximum amount.

22.   The Families First Coronavirus Response Act ("Coronavirus Response Act") and its amendments authorized the IRS to give a credit against employment taxes to reimburse businesses for the wages paid to employees who were on sick or family leave and could not work because of COVID-19 (the "paid sick and family leave credit," and, collectively with the ERC, the "COVID-19 Tax Credits").  The paid sick and family leave credit equaled the wages the business paid to employees during the sick or family leave, subject to a maximum amount.

23.   The taxpayer could request the COVID-19 Tax Credits on the IRS Form 941 (Employer's Quarterly Federal Tax Return) ("Form 941") and was required to truthfully state, among other things, the number of employees and business's quarterly wages.  The COVID-19 Tax Credits could generate refunds, and the taxpayer could request that the IRS pay the refunds in advance, before the business filed its quarterly employment tax return, through the filing of an IRS Form 7200 (Advance Payment of Employer Credits Due to COVID-19) ("Form 7200").

24.   Federal Tax Deposits ("FTDs"), among other things, consisted of employment taxes, including taxes that were withheld from employees' wages.  Certain employers were required to make periodic FTDs to the IRS, normally on a monthly or semiweekly basis.  On the IRS Form 941, the employer could then deduct the FTDs paid to the IRS for the applicable quarter from the total amount of employment taxes due to the IRS.

She Suite Ventures

25.   In or around January 2021, defendant HYNES obtained an EIN on behalf of a business called She Suite Ventures.

26.   For tax years 2020 through 2021, She Suite Ventures had no substantial business operations and IRS records reflect neither (i) the issuance of any Forms W-2, Forms 1099, or other wage reporting forms to any individuals, nor (ii) the payment of any FTDs to the IRS on She Suite Ventures' behalf.

B.   THE FALSE CLAIMS

27.   On or about July 13, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant HYNES made and presented, and willfully caused to be made and presented, to

the IRS, which is part of the United States Department of the
Treasury, a false, fictitious, and fraudulent claim against the
United States for the payment of a tax refund – namely, a Form 7200
filed on behalf of She Suite Ventures for the fourth quarter of 2021,
requesting approximately $195,911.41 as an advance payment of COVID-
19 Tax Credits – which claim defendant HYNES then knew to be false,
fictitious, and fraudulent in that She Suite Ventures was not
entitled to the claimed advance payment as reported on the return,
including because She Suite Ventures did not have the number of
employees claimed on the return and had not paid employees the amount
in wages, tips, and other compensation reported on that return.

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the defendant's conviction of the offense set forth in Count One of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

    (a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including but not limited to $120,925.10 seized on or about May 24, 2023, from Bluevine checking account ending in 5915, held in the name of Joseph Little Consulting, Joseph Little; and

    (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

11

1  been substantially diminished in value; or (e) has been commingled

2  with other property that cannot be divided without difficulty.

3

4                                    E. MARTIN ESTRADA
                                     United States Attorney
5

6

7                                    MACK E. JENKINS
                                     Assistant United States Attorney
8                                    Chief, Criminal Division

9                                    RANEE A. KATZENSTEIN
                                     Assistant United States Attorney
10                                   Chief, Major Frauds Section

11                                   KRISTEN A. WILLIAMS
                                     Assistant United States Attorney
12                                   Deputy Chief, Major Frauds Section

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28